WHARTON (MONTGOMERY v.). See Case No. 9,737.

---

## Case No. 17,482.

### The W. H. CLARK.

[5 Biss. 295.][1]

District Court, W. D. Wisconsin. May, 1873.

COLLISION — OVERTAKING STEAMER — TOWING
STEAMER—RAFT—DAMAGES—REPAIRS—
POSSIBLE EARNINGS.

1. Where two steamers are going in the same direction, it is the duty of the pursuing boat to avoid the other.

2. This rule, however, does not justify the leading vessel in suddenly changing her course so as to embarrass, or throw herself across the track of, the other.

[1] [Reported by A. J. Dallas, Esq.]

[1] [Reported by Josiah H. Bissell, Esq., and here reprinted by permission.]

3. Where there is no opportunity of passing, the pursuing boat should keep such a distance as to avoid all possibility of a collision.

4. When the colliding boat has a raft in tow, the boat is liable, not the raft.

[Cited in The Chickasaw, 38 Fed. 361.]

5. The boat furnishing the motive and directing power, having the pilot in the pilot-house, and giving the signals to the crew, must be held responsible for the proper management of the raft.

6. The fact that the expenses of the boat and its officers were charged to the raft, and that the owners of the raft employed the boat, is not material. This is a proper method of keeping the accounts, and does not affect the maritime relations of the boat and raft.

7. It seems, that admiralty jurisdiction could not be sustained against a raft. Quære.

[Cited in Re Raft of Cypress Logs, Case No. 11,527; The F. & P. M. No. 2, 33 Fed. 511.]

8. Full charges for repairs should not be allowed when the boat was old and somewhat decayed.

9. The party repairing should show positively that he has only reinstated the vessel in the condition she was before the collision.

10. The full amount which she might have earned should not be allowed as compensation for time lost.

In admiralty. This was a libel filed by the Northwestern Union Packet Company, as owner of the steamboat Mollie Mohler, against the steamboat W. H. Clark, to recover for damages sustained by the steamer Mollie Mohler, by collision with the W. H. Clark, near the bridge at Winona, Minnesota, on the Mississippi river, July 21, 1872, while the Mollie Mohler was engaged in towing a raft of logs from Beef Slough, in Wisconsin, to Rock Island, Illinois. Jeremiah Turner filed a claim as owner, and answered the libel.

William Hull, for libellant, made the following points, and cited the authorities as sustaining them:

I. The master and crew of the Clark had entire control of both boat and raft, consequently the collision is as directly attributable to her as if she collided with the Mohler. The Express [Case No. 4,596]; The Hector [Id. 6,317]; Pope v. The R. B. Forbes [Id. 11,275]; Owners of The James Gray v. Owners of The John Fraser, 21 How. [62 U. S.] 184; The Rescue [Case No. 11,708]; New York & B. Transp. Co. v. Philadelphia & S. Steamboat Nav. Co., 22 How. [63 U. S.] 461; Sturgis v. Boyer, 24 How. [65 U. S.] 110; The Maria Martin, 12 Wall. [79 U. S.] 31.

II. As both boats were going in the same direction, the Mollie Mohler could keep her course, and the Clark should have avoided her. New York & L. U. S. Mail S. S. Co. v. Rumball, 21 How. [62 U. S.] 372; Chamberlain v. Ward. Id. 548; The Chesapeake [Case No. 2,643]; The Carroll, 8 Wall. [75 U. S.] 302. The pursuing boat must, in passing, select a safe course at her peril. She has only the unoccupied water-way, whether stationary or moving with less speed than the passing boat. The Rhode Island [Cases Nos. 11,-743, 11,745]. The rear boat is not justified in coming within hazardous proximity to, or in crowding, the leader. If she does, she is liable for damages. The City of Paris [Case No. 2,765]. The Clark should have allowed the Mohler to continue her course and stopped in time. Ward v. Dousman [Id. 17,153]. Precautionary measures must be taken in time. Wakefield v. The Governor [Id. 17,-049]; The Louisiana v. Fisher, 21 How. [62 U. S.] 5. Varying movements of the Mollie Mohler, whereby the Clark was misled, will only excuse a departure from the rule. The Hansa [Case No. 6,036]. Various classes of collision defined. Abb. Shipp. 229; Ward v. The Fashion [Id. 17,154]; 1 Pars. Shipp. & Adm. 525. This was not an "inevitable accident," and could have been prevented by ordinary care. The Baltic [Case No. 823]. It was not "mutual fault," as the Mohler contributed not in the least. The Clark was culpably negligent in trying to tow a raft she could not manage. The Helen R. Cooper [Cases Nos. 6,333, 6,334]; The George Farrell [Case No. 5,332], The Syracuse, 12 Wall. [79 U. S.] 167. The Clark's negligence being proven, the onus is on her to prove that the collision was not caused thereby, and that it would equally have happened had she performed her duty. Martinez v. The Anglo Norman [Case No. 9,174]; 1 Conk. Adm. 383. Libellant's witnesses on the Mohler deserve greater credit as to her management than those of the Clark, or others not knowing the facts. Whitney v. The Empire State [Case No. 17,586]; Pope v. The R. B. Forbes [Id. 11,275]; The Narragansett [Id. 10,019]; The Neptune [Id. 10,120]; The Rhode Island [Id. 11,745]; The Bay State [Id. 1,149]; New York & L. U. S. Mail S. S. Co. v. Rumball, 21 How. [62 U. S.] 372, 382. A quasi custom cannot vary the law. The Clement [Case No. 2,879].

Damages should be for: 1. Raising, towing, dockage, and repairing of the Mollie. 2. A per diem compensation for loss of boat's services, at the rate hired, while necessarily being repaired. 1 Conk. Adm. 385; The Narragansett and The Rhode Island [supra]; The Cayuga [Cases Nos. 2,535, 2,537]; The Favorita [Case No. 4,694]; The Santee [Id. 12,329]; Williamson v. Barrett [13 How. (54 U. S.) 101]; The Baltimore, 8 Wall. [75 U. S.] 377; Sturgis v. Clough, 1 Wall. [68 U. S.] 269; 1 Pars. Shipp. & Adm. 538. Immaterial whether the vessel was weaker or stronger. Id. 543; Amoskeag Manuf'g Co. v. The John Adams [Case No. 338]; The Granite State, 3 Wall. [70 U. S.] 310. Offering or rendering no assistance to the injured vessel is a circumstance tending to show consciousness of fault. The Atlas [Case No. 633]. Whether raft is subject to admiralty jurisdiction, see Tome v. Four Cribs of Lumber [Id. 14,083.]

J. Hamilton Davis and Hugh Cameron, also for libellant.

Thomas Wilson, for respondent.

The raft only is liable, the boat being employed solely and only as a motive power, and being exclusively under the management of the raft's master and crew. Proceedings in admiralty may be had against a raft. The Rock Island Bridge, 6 Wall. [73 U. S.] 213; A Raft of Spars [Cases Nos. 11,528, 11,529]; 16 Stat. 453, 454, § 47. If it was illegal for the Clark to tow a raft she could not handle, the same is true of the Mollie, for she could not handle herself, and the court will in such cases leave the parties where it found them. The Leopard [Case No. 8,264]; 1 Pars. Shipp. & Adm. 528, and cases cited; Sturgis v. Clough, 21 How. [62 U. S.] 45. The damages cannot be divided, as the Clark was not negligent, and if it admitted of a reasonable doubt even, the loss must be borne by the party on whom it falls. The Grace Girdler, 7 Wall. [74 U. S.] 196, 203. The respondent must be affirmatively and specifically held in fault to allow damages. The Breeze [Case No. 1,829]; 1 Pars. Shipp. & Adm. 328, 329; The Wm. Young [Case No. 17,760]; 3 Greenl. Ev. § 404. The libellant must prove herself clear of fault, and also culpable negligence or actual misfeasance against the other to recover for a collision. The Relief [Case No. 11,693]; Ward v. The Fashion [Id. 17,154]; The Columbus [Id. 3,043]; The Marpesia, 7 Am. Law Rev. 287; Martinez v. The Anglo Norman [Case No. 9,174]; The Randolph v. U. S. Id. [11,562]. If neither party is in fault the loss rests where it falls. The Eliza and Abby [Id. 4,349]; 1 Pars. Shipp. & Adm. 525. The same of an inevitable accident. Id. 525, and note. The law exacts of officers only ordinary foresight and skill. The Eliza and Abby and The Grace Girdler, supra; Shear. & R. Neg. §§ 29–31.

Guy C. Prentiss, also for respondent.

HOPKINS, District Judge. If I were to believe the testimony given on each side, in this case, I should have to find that there was no collision, for if the witnesses testify truly, it was entirely impossible that the boats could have got together at that point; but taking the collision as established and admitted, I have, after a great deal of consideration and examination of the testimony, maps, plats, diagrams and distances from the bridge, elevator and other monuments in that vicinity, arrived at a conclusion, quite satisfactory to my own mind, as to the manner in which, and through whose fault, the collision occurred. The Mohler, at about four o'clock on the morning of the 31st of July, 1872, started with her tow, a raft of logs, about 110 feet wide by 450 feet long, from a point about four miles above the Winona bridge across the Mississippi river. The steamer W. H. Clark, about the same time in the morning, started at a point about four miles above with her raft, an eight-string lumber raft, being about 130 feet wide by 450 feet long. The Mohler was commanded by C. H. Jewell, a licensed pilot, and the Clark by Mr. Turner, a licensed pilot, the claimant in this case. The Mohler, owing to an injury to her raft the evening before, did not tow ahead with her wheel, but floated with the current in order to give the hands an opportunity to repair her raft. The Clark followed after her at nearly double her rate of speed, so that when the Mohler arrived at the bar opposite the elevator, about 1,000 feet above the bridge, the Clark had arrived at the point of Rolling Stone island, a distance of only 1,800 feet from the Mohler, and following in her track. The bow of the Mohler, after going over the reef, was thought to be too far out in the stream to go through the west draw of the bridge with safety, and thereupon the Mohler, in order to straighten it with the stream, backed her wheel, by which the bow was thrown in by the current; in doing which, some detention occurred, and the Mohler did not move as rapidly as the current. The Clark followed on in the same course, gaining rapidly upon the Mohler, and when it reached the reef opposite the elevator and turned the bow of its raft to run through the west draw, the bow of its raft was not to exceed 200 feet from the stern of the Mohler, and was going much more rapidly than the Mohler. At that time the danger of the collision became imminent to the persons in charge of both boats. The Mohler, having her raft straightened up, went ahead on her wheel, but before she had made many revolutions or produced much effect upon its motion, she had to stop, as the bow of the Clark's raft was getting so close as to endanger her wheel. The Mohler and her raft then floated with the current until the collision. The captain of the Clark, when opposite the elevator, seeing, as he says, that he was rapidly gaining upon the Mohler and coming in dangerous proximity to her, gave a signal with his whistle to put out a line, changed the position of his boat so as to assist to land his raft, and also gave signal whistles to the oarsman on the bow to throw in the bow, and gave orders to snub the raft and land it as quickly as possible, so as to avoid collision with the Mohler; that the line was put out and fastened to the piling just below the elevator, as he could not land in front of the elevator on account of barges tied there. The speed of the raft was not checked until it passed by the stern of the Mohler, and struck her with a forward and flanking-in motion about five feet forward of her stern post and broke a hole in her hull about ten feet long and twenty inches wide, from the effect of which she immediately filled with water and sank, and was dragged by the current and raft through the pier below the bridge and was there left in water about up to her upper decks. The raft of the Clark was stopped by the line and the collision, and in a short

time after passed between the piers and by the Mohler on her course. The current below the reef was at the rate of two and a half miles an hour, and from Rolling Stone point to the reef from 3½ to 4 miles. The pilot on the Clark testified that she did not go ahead on her wheels at all after they left the point until the collision. except a few strokes just before the collision, to aid them in landing their raft. to avoid it.

The question to be first determined is whether either party was at fault, and if so, which. That must be solved by the application of certain well-settled rules of law relating to boats in such cases. In the first place, I regard it as settled beyond controversy that when two steamboats are going in the same direction the one ahead is entitled to keep her course, and it is the duty of the pursuing boat to avoid her. This rule, however. does not go to the extent of justifying the leading vessel in suddenly changing her course so as to embarrass, or throw herself across the track of the pursuing boat. The 17th article of the act of congress of April 29, 1864. provides (13 Stat. 61) that "every vessel overtaking another vessel shall keep out of the way of said last-mentioned vessel." But the 18th, 19th and 20th articles provide that due regard shall be had to the circumstances of each case. The Grace Girdler, 7 Wall. [74 U. S.] 196. But I do not see in this case that the Mohler was guilty of any sudden change, or maneuver calculated to embarrass or change the course pursued by the Clark. It is true she backed after passing over the reef, to straighten her raft, as her pilot says, so that she could go through between the piers of the bridge safely. Mr. Hanks, a very intelligent and experienced pilot, called as a witness on the part of the respondent, testified that the current at the reef is such, that "the bow of a raft is often thrown out a little. and as it goes over it turns again towards the Minnesota shore. and sometimes we have to back up under the reef to straighten our raft before going through." From this it appears that backing in the manner the Mohler did is not unusual at that place.

The doctrine in relation to the rights and duties of vessels going in the same direction is very fully stated in the case of Whitridge v. Dill, 23 How. [64 U. S.] 448, in which case the opinion of Judge Betts, in the case of The Governor [Case No. 5,645], is quoted approvingly, and in which he expresses the rule as follows: "But from the fact that they were running in the same direction, the one astern of the other, there is imposed upon the rear boat an obligation to precaution and care which is not chargeable to the same extent upon the other. * * * The rear boat in such case must stop her way or back off and await the opening of a sufficient passage. if the leading boat is so placed that safe room is not left to pass

without coming within a hazardous proximity to her."

The general law of navigation secures to vessels under way the track they are rightfully pursuing. and makes it cause of damage for others to molest or crowd upon them in it. This rule would not allow the leading boat to unnecessarily obstruct the navigation. or to maneuver with a view to embarrass the boat following. and there is nothing in the testimony in this case to warrant the conclusion that the Mohler did anything to obstruct the navigation, and as there was no chance for passing at that point. the Clark should have kept back a proper distance to have avoided all possibility of a collision. The rule upon that subject, as laid down in the case of The Carroll, 8 Wall. [75 U. S.] 302, 306, is as follows: "The safeguards against danger, in order to be effectual, must be seasonably employed, and in this case they were not used until the danger was threatening." The same remark is applicable to this case, for here when the danger became imminent, the respondent did all he could to avoid it, but his efforts were unavailing because too late. The court in that case also say its greater fault was in suffering the vessel to get into such dangerous proximity at the moment preceding the collision, and as she has furnished no excuse for this misconduct she is chargeable with all the damages resulting from the collision. This respondent, judged by that rule, is equally liable. for his fault was in following too close to the Mohler. In a place of that description, where the passage was too narrow to allow one vessel to pass the other, her pilot should have kept her back a sufficient distance to avoid accidents or unavoidable delays in the navigation of the Mohler; and here the question arises as to what course he could have pursued to avoid it? Upon this question the testimony of experts is very conflicting and unsatisfactory. The witnesses on the part of the libellant testify that he could have landed his raft at various points below Rolling Stone, and above the elevator, and Mr. Register, an old and experienced pilot. testifies that he has often landed floating rafts between those points.

The libellant's witnesses also testify that at Rolling Stone point, or at any point until he got to the reef. he might have changed his course and gone through the east draw, that the water and passage were as good through that as through the west. except that it was a little safer and easier to steer by the land than by the piers alone: while the claimant and his witnesses testify that it would have been very hazardous, if not impossible. to have landed above the elevator, and that in order to have gone through the east draw it would have been necessary to have changed the course at the point of Rolling Stone island. and that they would deem it hazardous to run

the east draw with an eight-string raft; but I do not understand any of them to state that it would have been impossible. It would doubtless require more skill than to run by the shore, but as the center pier extended up the river for some distance above the bridge, and was planked up solid, so as to avoid all danger of catching in case the raft should strike against it, I cannot regard it is an undertaking of sufficient hazard to justify him in crowding upon the Mohler in order to avoid the risk of running through the east draw. Indeed, Mr. Davidson, an experienced pilot in running rafts both by boat and floating, and who manifested great candor and impartiality in his testimony, testified that he had run an eight-string raft through the east draw without trouble. He also stated that "it would have been difficult for the Clark to have gone through the east draw, starting at Yeoman's Mill (which is about 600 feet below Rolling Stone point); but I think it could have been done, and situated as those boats were, if I had apprehended any danger, it would have been safer to have undertaken to go through the east draw." I think this testimony shows that the passage through the east draw was not impracticable by any means, and under the circumstances I think the respondent should have essayed its passage. The testimony shows that rafts did run through it, and the claimant swears that he had run it on other occasions himself, so I cannot find, under the testimony, that the passage through the east draw was impracticable with an eight-string lumber raft, or that it was impossible to have landed it above the elevator and below the point of Rolling Stone island, or that the danger in attempting to do so was sufficiently imminent to excuse him from trying to do either to avoid the collision.

But it is contended on the part of the claimant, and with a good deal of plausibility, that he did not apprehend any danger of a collision until after he had got far below the point where he could make that passage, and if the Mohler had kept on as she ought to have done, he would not have overtaken her, but I cannot view the case in that light. He had been following the boat all the morning, and knew that he was going about as fast again as she was, that in two hours he had gained upon her nearly four miles that morning, which was enough, in my opinion, to put him on his guard, and to require him to adopt timely precautions against danger, especially as they were approaching a place where to pass would be impossible.

I think the facts were sufficient to cause apprehension on the part of the claimant. He was negligent in not comprehending the dangers of the situation. That there was danger to be apprehended, the event demonstrated, and he, as an experienced seaman, should have taken timely precautions to avoid it; and not having done so, I think the respondent is liable for all the damages occasioned by the collision. I think the Mohler was not managed in the most skillful manner. Her pilot might, perhaps, have gone faster than he did with safety, but that question under the law was left largely to his discretion. He was ahead and had the right of way, and had the right to be cautious, and I do not see any such abuse of that right as to justify me in holding that the Clark had the right to run into his boat, or in dividing the loss, which at the time of the conclusion of the argument I felt strongly inclined to do.

Having determined that the libellant is entitled to recover for the injury of the offending party, it becomes necessary to ascertain whether it is the boat or the raft that is liable. The respondent contended that it was the raft; that the boat was but the mere agent of the raft, and under the exclusive control of the officers of the raft.

The raft had no motive power of its own. It would float with the current of the stream and be borne along with it, but in and of itself it had no motive power or contrivances for utilizing any power to promote its propulsion. The steamboat was therefore employed to propel it and manage it, or, in other words, to navigate it.

A block called a "butting block" was placed on the stern of the raft, against which the steamer pushed with its bow to move it ahead. It had a line called a "backing-line" fastened to the raft and the bow of the boat to enable the steamer to back the raft. It had guy lines attached to each side of the stern of the boat, running around each rear corner of the raft to a capstan stationed in the centre of the raft to steer the raft by. The position of the boat to the raft was fixed and regulated by the use of the capstan and those guy lines. In that way the boat was made to apply its power directly or obliquely so as to propel the raft straight ahead or to the right or left, as the necessities of the case might require. It was not only therefore the motive power, but was the steering or directing power.

The boat was run and managed by Mr. Turner, a pilot licensed to run tow-boats. He alone had authority in law to run the boat. The boat was licensed and duly enrolled as a tow-boat, and as such was within the regulations prescribed by the acts of congress.

The signals to the crew for managing the raft proceeded from the pilot-house, and the pilot in charge of the boat gave them by sounding the boat's whistle. The raft had no pilot other than the pilot of the boat. He had the direction of the whole craft, boat and raft, and gave all the directions for its navigation. The boat had no master but its pilot, and the raft had neither pilot nor master distinct from the boat.

I think, therefore, the boat was liable, and that the claimant is mistaken in supposing that the boat was under the exclusive direction of the officers and crew of the raft. I think the case comes under the third rule laid down in Sturges v. Boyer, 24 How. [65 U. S.] 122, that "when the tug, under the

charge of her own master and crew, and in the usual and ordinary course of such an employment, undertakes to transport another vessel, which for the time being has neither her officers nor crew on board, over waters where such accessory motive power is necessary or usually employed, she must be held responsible for the proper navigation of both vessels." That, I think. describes the position of the boat and tow in this case. See, also, The Maria Martin, 12 Wall. [79 U. S.] 44.

This view is strongly supported by the evidence of the respondent's expert witnesses showing what experience and knowledge is requisite for a pilot to run a raft with a steamboat. They testify that a steamboat pilot cannot run a steamboat with a raft in tow, nor can a raft pilot run a raft towed by a boat; that to run a boat towing a raft a peculiar knowledge and skill is necessary, which can only be acquired by a long experience in that service. The libellants dispute this, but all admit that it is a new method of moving rafts, and that the rafts are under the control of the pilot of the boat; that he is expected to combine the requisite skill to navigate both, and both are under his control as master, and the whole is under and subject to the control of the boat in which the motive power employed resides. The steamboat, therefore, is the active thing. and consequently is to be treated as the offender, and held liable for damages that it should have prevented by a judicious and careful management of the raft.

The counsel for the claimant contended with great earnestness and apparent confidence that, as the account of the expenses of the boat and officers of the boat were charged to the raft, this was a controlling circumstance in determining which was the principal and which the agent. But that circumstance failed to impress me at the time as possessing much significance, and further reflection has not changed my first impression. The owners of the raft had to pay the towboat for her services, and the mere form or method adopted by them in keeping that account is quite immaterial. It was well enough to charge it to the raft, as in that way they could conveniently ascertain the cost of the lumber and determine at what price they would have to sell it to clear themselves. It was a convenient mode of keeping their accounts. not at all affecting the relation of the boat to the raft in a maritime sense.

I have thus far considered the question as if the raft could be held liable in admiralty for an injury of this character, but I do not intend to pass upon this question. In the view I have taken of the relation and liability of the boat, it is not necessary. But from the examination I have given it. I do not at present see upon what principle admiralty jurisdiction could be sustained against a raft of lumber.

Chief Justice Taney in Tome v. Four Cribs of Lumber [Case No. 14,083], says: "They are not vehicles intended for the navigation of the sea. They are not recognized as instruments of commerce or navigation by any act of congress; they are piles of lumber and nothing more, fastened together and placed upon the water."

Notwithstanding the great extent of rafting lumber upon the navigable streams in this country, I cannot find a case where they have been proceeded against in admiralty, except that case and the cases Raft of Spars [Case No. 11,528] and The Josephine [Id. 7,-545], which were all salvage cases.

It is true the judge in delivering the opinion in the Case of Rock Island Bridge, 6 Wall. [73 U. S.] 213, says: "A maritime lien can only exist upon movable things engaged in navigation," and in enumerating them mentions "rafts" among others, but the question involved in this case was not before the court, and that part of the opinion may not therefore be considered as authoritative.

But as I do not deem it necessary to decide this question I shall not pursue the argument further. I have only said this in deference to the very able argument of the learned counsel of the claimant upon the questions at the trial. Indeed I feel under great obligations to the learned counsel on both sides, for the able, careful and instructive arguments they submitted, both upon the facts and law, and particularly for the full references to the authorities bearing upon the questions involved.

Having arrived at the conclusion that the libellant is entitled to recover against the steamboat the damages sustained by the collision, I find it quite perplexing and difficult to determine the true amount thereof, which was submitted to me without a reference to decide.

It is apparent from the evidence that the boat was somewhat decayed, and suffered more on that account than a stanch boat would, and also required more repairs. The libellants raised and repaired the boat themselves, and in repairing changed it in some respects, and it seems to me the charges for the repairs are very large, and I cannot understand why such extensive and general repairs were necessary. A hole about twenty inches wide by ten feet long was broken in her hull and she sank immediately, and while she was lying in the stream some of her upper works were injured by passing boats. She was probably strained some in raising, but I do not feel that the evidence shows satisfactorily that all the repairs and work done upon her were made necessary by the collision. When the owner raises and repairs the boat himself, it is necessary to examine more closely the charges than when done by a third person, for reasons too obvious to require to be stated.

I have concluded therefore. under the testimony offered. that not more than one-half of libellant's charges for repairs should be allowed as properly attributable to the collision, and have therefore allowed that ac-

.count at only $756. The rule is, that "a party should show positively that they had no more than reinstated the vessel in the condition she was before the collision." This the libellant omitted to do, and I have therefore to exercise my best judgment on that question.

The libellant claimed a per diem allowance for the time the boat was undergoing repairs. That seems to have been settled in Williamson v. Barrett, 13 How. [80 U. S.] 101. as a proper item of damages in case of collision. But I hardly think it proper to allow the same compensation as when in use, as the wear and tear when used is something, as well as the ordinary risk of navigation. The Rhode Island [Case No. 11,740a].

The court also allowed, for use of steamers or barges to raise the wreck, $500; for use of steam pump, $100; for fuel $100; and miscellaneous charges and expenses to the amount of $273.50, making a total of $1,929.50, for which costs he directed a decree to be entered in favor of libellant.