## John McCaffrey v. Knapp, Stout & Co. Company et al.

1. LIENS—*For Towing Rafts.*—The owner of a steamboat engaged in towing a raft of lumber for a third person, is entitled to a lien upon each piece and parcel of the lumber therein for the carriage of the entire raft while it remains in his possession, and the person for whom such towing is done, can not change or defeat such lien by directing him to divide the raft and bring a portion of it only, to its destination.

2. SAME—*Not Defeated by Delay in Enforcing Payment.*—Where the owner of a steamboat has a lien upon the lumber in a raft for his services in towing the same, such lien is not defeated by his delay in enforcing payment for other rafts previously towed by him for the same person.

3. SAME—*Remedies in Equity.*—The owner of a steamboat having a lien upon a raft of lumber for towing the same, may enforce his lien in a court of equity.

McCaffrey v. Knapp, Stout & Co. Company.

4. POSSESSION—*Of Personal Property—How Determined.*—The question as to who ha's possession of property in litigation, is one of fact to be determined from the preponderance of evidence.

5. SAME—*Persons Employed to Watch Property.*—Where a person employs another to watch property, he does not, by that fact alone, put him in possession of it. A mere watchman is not necessarily in possession of the property he guards.

6. ESTOPPEL—*To Assert Want of Jurisdiction.*—Where the owner of a steamboat filed his bill in a State court to enforce his lien for towing a raft of lumber, and the defendant filed his petition, asking that he might, upon giving a bond to pay the complainant whatever lien might be established in his favor, take possession of the lumber, which was allowed, and possession of the lumber delivered to him, he was held to be estopped by such action from questioning the jurisdiction of the State court.

7. MARITIME JURISDICTION—*Where a Case is Not Within.*—Where a bill was filed in a State court to enforce a lien upon a raft of lumber for towing the same in a navigable river, and the defendant, on his own application, obtained an order for the possession of the raft by executing and filing a personal bond in court, conditioned to pay and discharge whatever lien the court might find to exist upon it in favor of the complainant, *it was held,* that the suit thereafter became one *in personam* and not within the jurisdiction of a court of admiralty.

8. MARITIME LIENS—*Admiralty Jurisdiction—Quare.*—Whether he who, in the performance of a contract, renders services in towing a raft of lumber in a navigable river, has a maritime lien thereon for such services, and whether such raft is a proper subject of admiralty jurisdiction, are questions upon which the authorities are in conflict. (Authorities cited.)

In Equity.—Bill to enforce a lien. Appeal from the Circuit Court of Mercer County; the Hon. JOHN J. GLENN, Judge, presiding. Heard in this court at the May term, 1897. Reversed and remanded with directions. Opinion filed December 17, 1897.

SCOTT & COOKE and BROOK & GRAHAM, attorneys for appellant.

The delivery of a part of a cargo does not defeat a lien upon the remainder for the whole freight. Morgan v. Congdon, 4 N. Y. 551; Potts v. New York & N. E. R. R. Co., 131 Mass. 455.

When a bailee for hire is in possession of the property bailed he has a lien for his hire and the correct method for its enforcement is by bill in chancery. Fox v. McGregor, 11 Barb. (N. Y.) 41; 1 Cowen's Tr., 2d Ed. 299; Pomeroy's

Equity Jurisprudence, Vol. 1, Sec. 171, page 195; Redfield on Railways, 2d Ed., star page 317, Sec. 14; Schouler's Personal Property, Vol. 1, Sec. 387.

Where there is a lien upon freight it is not lost unless there be an absolute and unconditional delivery of the property. Lane v. Old Colony & F. R. R. R. Co., 14 Gray (Mass.) 143; Boggs v. Martin, 13 B. Mon. (Ky.) 239; Costello v. Laths, 44 Fed. Rep. 105.

WISE & McNULTY and BASSETT & BASSETT, attorneys for appellees.

There is no express lien given by the contract, and none will be raised by implication of law, because it is evident by the terms of the contract that McCaffrey relied upon the personal responsibility of the Lumber Company. The Canal Boat J. M. Welsh, 8 Benedict, 211.

The contract being maritime, if a lien is given by it, then to enforce it, the United States admiralty courts have jurisdiction, exclusive not only of Federal courts, but of all State courts. The Genesee Chief v. Fitzhugh, 12 How. (U. S.) 457; The Magnolia, 20 How. (U. S.) 296; The Moses Taylor, 4 Wall. 411; The Hine v. Trevor, 4 Wall. 555; The Belfast, 7 Wall. 624; The Eagle, 8 Wall. 15; The J. E. Rumbell, 148 U. S. 1; Moran v. Sturges, 154 U. S. 256; The Glide, 17 Sup. Ct. Rep. 930.

The admiralty jurisdiction extends to the entire navigable river system of the United States. The Hine v. Trevor, 4 Wall. 555; In re Garnett, 141 U. S. 1; McGinnis v. Steamboat Pontiac, 5 McLean, 359; The Montello, 87 U. S. (20 Wall.) 430; Jackson v. Steamboat Magnolia, 20 How. 296; Ex parte Boyer, 109 U. S. 629.

The ninth section of the act of 1879 saves to suitors, in all cases, the right of a common law remedy, where the common law is competent to give it. This has been incorporated in all subsequent revisions of the United States statutes, and is now the law. This suit does not come within this saving clause; it is not an action at common law, but a suit in equity. The Moses Taylor, 4 Wall. 411; Moran v. Sturges, 154 U. S. 256.

Equity has no jurisdiction to foreclose a common law lien. Such a lien is merely passive, and the remedy is to retain the possession of the property until the debt is paid. The lienor has no right to sell the property. Jones on Liens, Sec. 1038; Benedict on Admiralty, Sec. 290; Story's Eq. Jur., Sec. 506; Jones on Liens, Sections 3, 4, 20, 21 and 335; Briggs v. Boston & Lowell R. R. Co., 6 Allen, 246; The Thames Iron Works and Ship Building Co. (Limited) v. The Patent Derrick Co. (Limited), 29 Law Journal, N. S. (Ch.) 714; Indianapolis & St. L. R. R. Co. v. Herndon, 81 Ill. 143; Doane v. Russell, 3 Gray, 382.

MR. JUSTICE DIBELL DELIVERED THE OPINION OF THE COURT.

This was a bill in equity filed in the Circuit Court of Mercer County, by John McCaffrey against the Schulenburg & Boeckeler Lumber Company and its assignees, and Knapp, Stout & Co. Company. Said corporations, for brevity, will here be called the Schulenburg Company and the Knapp Company. The object of the bill was to establish and enforce a bailee's lien upon a half raft of lumber at Boston Bay in Mercer county. The Knapp Company applied for and obtained an interlocutory decree under which it gave bond and took the raft away. Answers were filed and replications thereto, and there was a hearing and a decree dismissing the bill without prejudice, from which decree McCaffrey prosecutes this appeal.

On April 6, 1893, the Schulenburg Company and McCaffrey entered into a written agreement by which (among other things) McCaffrey was to tow rafts of lumber from Stillwater to St. Louis for the Schulenburg Company at certain prices therein fixed. There were many provisions of the contract not material to the present suit. McCaffrey towed many rafts for the company under said contract, and prior to October 6, 1894, the Schulenburg Company was largely indebted to McCaffrey for towing charges under said contract, which indebtedness is still unpaid. On October 13, 1896, McCaffrey's steamer, the Robert Dodds, George Tromley, Jr., master, left Stillwater with raft num-

ber ten of that year. The water was very low in the river and the progress of the raft was slow. The Schulenburg Company was in haste for its lumber, and pursuant to its directions the raft was divided by Tromley at Boston Bay, and one-half was taken into the bay and there fastened and left in charge in the manner hereinafter stated, and the other half of the raft was taken to St. Louis and there delivered on November 2d. The Schulenburg Company then paid the clerk of the boat $1,250 without any directions as to its application, and McCaffrey applied it on the amount due him for towage of other rafts. The company then directed Tromley to leave the half raft in Boston Bay till spring, and delivered to him two additional lines to be used by him in making the raft more secure to the shore. The steamer reached Boston Bay again on the morning of November 4th, and the captain and crew on that day did certain things and left certain directions for the care of the half raft during the winter, which will be hereinafter stated. On the next day, November 5th, at St. Louis, the Schulenburg Company sold said half raft to the Knapp Company for $15,000, part in cash and part in a note due in four months, which was afterward paid. On November 9th the Schulenburg Company made a voluntary assignment at St. Louis for the benefit of creditors. McCaffrey offered both to the Schulenburg Company and to the Knapp Company, to tow said half raft to St. Louis under his contract, but the Knapp Company forbade his doing so, and informed him that it did its own towing. Finally McCaffrey, claiming still to be in possession of the half raft, but believing that the Knapp Company was about to seek to take it from him by force, filed this bill, with the results already stated.

The first question is whether McCaffrey had a lien on the raft for his towing charges while the raft was in his possession. He had no lien by contract, for that instrument gave him none. A common carrier has at common law a specific lien upon the goods carried for his charges in transporting them (13 A. and E. Ency. of L. 580), and our statute (Ch. 141) provides a means for enforcing it; but the weight

of authority is that the owner of a steamboat engaged in the business of towing is not a common carrier (Caton v. Rumney, 13 Wend. 387; Alexander v. Greene, 3 Hill. 9; Story on Bailments, Sec. 496; Anderson's Law Dict., title "Tow Boat"), and much more is this so where, as here, he tows only for a single party. Stephen thus defines bailment : " Bailment is the delivery of goods for some purpose, under a contract, express or implied, that after the purpose has been fulfilled they shall be redelivered to the bailor, or otherwise dealt with according to his directions, or kept till he reclaims them." 3 A. and E. Ency. of L., 2d Ed. 733. The word "goods" in this and other like definitions obviously includes every article of movable and tangible personal property. Among the purposes included within said definition of bailment is "the hiring of the carriage of goods from one place to another for a stipulated or implied reward." Cowen's Treatise, 3d Ed., 67; Story on Bailments, Sec. 8. There is nothing in this definition which excludes carriage of goods by water, and that such carriage comes within the principles of bailment, is evident from Story on Bailments, Secs. 496, 501, 504, and elsewhere. The carrier of goods has a lien thereon for his hire while he retains possession. Story on Bailments, Sec. 588. This lien extends to all the goods delivered under one contract, although they be delivered in different parcels and at different times, and the bailee may detain any portion of them as a lien upon the whole, even if he has delivered a part. 3 A. and E. Ency. of L., 2d Ed. 760; Morgan v. Congdon, 4 N. Y. 552; Schmidt v. Blood, 9 Wend. 268; McFarland v. Wheeler, 26 Wend. 467; Potts v. New York & N. E. R. R. Co., 131 Mass. 455; Blake v. Nicholson, 3 Maule & S. 167; Chase v. Westmore, 5 Maule & S. 180.

Up to the time the whole raft reached Boston Bay, McCaffrey had a lien on each piece and parcel of lumber therein for the carriage of the entire raft. The Schulenburg Company could not change or defeat that lien by directing him to divide the raft and bring half to St. Louis first. That direction was solely for its benefit. McCaffrey was ready

and willing and offered to tow the half raft to St. Louis, but was refused permission, and his right to do so was denied by the purchaser. This excused, and indeed prevented, his further performance. Therefore McCaffrey had a common law bailee's lien on said half raft while in his possession at Boston Bay, for the towing of the entire raft at the contract price.

His claim is for $3,795.82. This sum we consider established by the proofs, except two items. The charge of $93.31 for towing grub planks should be rejected, because, under the contract, his charge for towing the lumber on the raft included the grub planks. The charge of $59.34, the sum McCaffrey became liable to pay Woods for watching the raft, should be rejected. He was not hired to protect the raft from any danger to it, but to protect McCaffrey's possession and lien against any attempt by the Knapp Company to take the raft away. McCaffrey had no bailee's lien therefor. This leaves $3,643.17 for which, in our opinion, complainant had a bailee's lien on said half raft while he retained possession and which would bear interest at five per cent per annum from the date when the Knapp Company forbade McCaffrey to tow said half raft to St. Louis under his contract, which was November 12 or 13, 1894. It is suggested there is no lien, because the practice had not been to pay till after delivery. But the contract does not provide when payments shall be made, and the price agreed was therefore due when the service was rendered. Delay in enforcing payment for other rafts, which was merely of favor to the owner, could not defeat the lien. McCaffrey filed a claim against the Schulenburg Company, insolvent, for nearly $25,000, and included this claim therein, and it is argued he thereby waived his lien. But in the written claim filed he expressly asserted a lien on said half raft for these charges, and stated therein that he retained the right to enforce said lien. It is not shown that said claim was ever allowed or put in judgment, and it has not been paid. The mere filing of a claim thus guarded did not release the lien.

McCaffrey v. Knapp, Stout & Co. Company.

The main question of fact in dispute is whether McCaffrey had possession of said half raft after he took it into Boston Bay. We regard the following facts as established by a clear preponderance of the evidence : The shore where this half raft was laid up was held under lease from the owner by the Burlington Lumber Company. Rafts were often put in and laid up there and tied to its shore, and their owners paid for the privilege certain harbor charges. The Burlington Company employed Willits as its watchman to attend to that business there, and to watch all rafts that put in there, and paid him one dollar per day the year round for his services. It seems to have been the usual practice of those who left rafts there to make the bargain with and pay Willits for watching, and for the shore privileges, and he settled with the Burlington Company. When this steamer and raft reached Boston Bay, Tromley told Willits he wanted to leave that half raft there ten or fifteen days, and perhaps for the winter. They made an agreement that Willits should watch the raft, and that Tromley should pay him for it when he took the raft away. Willits and the clerk of the steamer counted the raft, but Willits refused to give a receipt for it and said he would not be responsible for anything that might be gone. Willits told the crew where to put the raft, and they placed it accordingly, and fastened it to the shore by three or four lines, all the property of McCaffrey. They also fastened a fuel barge eighty feet long, owned by McCaffrey, at the stern of the raft. All this work was done by McCaffrey's men. Willits took no part. At St. Louis the Schulenburg Company told Tromley to leave the half raft in Boston Bay till spring, and gave him two lines to use in making the raft more secure. The steamer on its return reached Boston Bay on the morning of November 4th. On that day the crew took several cribs of lumber out of the river side of the raft and set the steamer in the place thus vacated and fastened it to the raft, and fastened the raft and steamer and fuel barge more securely to the shore. They left the boats and raft tied to the shore by seven lines, five belonging to

McCaffrey and the two which the Schulenburg Company sent, and said steamboat, barge and raft so remained fastened together and to the shore all winter. The steamer was left there so as to be ready to tow the half raft to St. Louis in the early spring. This work was all done by the crew of the steamer. Willits did not help. Tromley then told Willits to watch the raft for the winter, and that McCaffrey would pay for it, and if he did not the steamer would be good for it. Willits did not dissent, but it is not clear that he expressly agreed to do so. Tromley also hired Willits to watch the steamer during the winter for $60. No price was fixed for watching the raft because there was a usual price for that service. Tromley and crew left for Davenport the afternoon of November 4th. Meanwhile, on October 27th, Willits had sent a postal to the Schulenburg Company, telling them the steamer Robert Dodds had left said lumber there, and if it was to stay over the winter they should send two more lines by the steamer. The Schulenburg Company replied on October 30th, saying they would send the lines if the raft was to be laid up there all winter, and adding, " Do everything in your power to assure safety of same while in your possession." On November 5th, the day of the sale to the Knapp Company, the Schulenburg Company wrote Willits they had sold the raft to the Knapp Company, and " they will settle with you as to storage charges." On November 6th the Knapp Company wrote Willits they had bought the raft and had an order on him for it, and saying, " Take charge of the raft for us from this date." On the day of the assignment, November 9th, at the request of the Knapp Company, the Schulenburg Company telegraphed Willits of the sale on November 5th, and saying, " They should have possession on and after that date." On November 9th the Knapp Company also sent Baker to Boston Bay to see if everything was in place, and if the raft tallied with the invoice. He reached there on the morning of November 10th, and he and Willits counted the raft, and he got Willits to give him the following receipt, dated back to November 5th: " Received of Knapp, Stout

& Co. Company, 144 cribs of lumber of Schulenburg & Boeckler manufacture, deck loading thereon, two lines thereon holding said cribs, and whatever there is at New Boston." When McCaffrey heard of the assignment he sent his son Henry to Boston Bay to place another man on the raft, with directions to stay there day and night, and to sleep on the boat, this precaution being taken because Willits was often absent and did not sleep there at night, and McCaffrey feared some one might take the raft away in the night. Henry reached Boston Bay on November 10th, and hired Woods to watch the boat and raft and sleep on the boat, but told him not to interfere with Willits. Henry left without seeing Willits, whom he was unable to find. Woods applied to Willits for the key to the boat, but Willits would not give it to him then, though he did some days later. Willits wrote McCaffrey complaining of the employment of Woods, and McCaffrey replied that it was owing to business complications, and was not intended to take the watching away from him, and closing: "You will please comply with our directions till we advise you otherwise." Woods watched the raft from November 10th till it was surrendered under the order of the court, and slept on the boat till the river froze over. When the river thawed in the spring McCaffrey also hired Williams, and he thereafter slept nights in a boat of his own alongside the raft. The clerk of the steamer returned to the steamer on November 17th and stayed there till the bay froze over. He and Woods fixed a couple of cribs, put on some more grub planks (which hold the cribs together), straightened up the deck loading, and took the slack out of several of the lines. When Woods asked Willits for the key to the boat on November 10th, Willits replied that he was watching the boat and raft for John McCaffrey and had no orders to quit. When the clerk of the boat was there November 17th Willits said to him: "I am watching that boat and raft for you folks; I will never deliver the raft up if anybody comes for it without hearing from McCaffrey." Willits' partial denial is overborne by the preponderance of the evi-

dence.   In the spring McCaffrey paid Willits $60 for watch-
ing the steamer, and offered to pay him for watching the
raft, but Willits refused the latter, having in fact taken
money from the Knapp Company under the agreement here-
inafter stated.   In the spring McCaffrey heard the Knapp
Company was going to take the raft away (as in its answer
it says it intended to do when it chose) and employed five
or six men to retain possession, and still later brought forty
or fifty men from Davenport for the same purpose.   Up to
a year before the McCaffrey contract was made, the Schu-
lenburg Company had a contract with the Burlington Com-
pany for shore privileges, and paid that company $300 per
year therefor, and all its correspondence relating thereto was
with Willits, and it paid him for watching the rafts.   After
the McCaffrey contract was made it had no such contract
with the Burlington Company or with Willits, and paid
nothing during 1893 and 1894 to either Willits or the Bur-
lington Company.   Willits testified that when this raft was
first left with him by Tromley in October, 1894, he under-
stood he was employed by the Schulenburg Company to
take charge of it.   He admits nothing to that effect was
said to him, and the evidence discloses nothing upon which
to base that assumption.   The Knapp Company had several
steamboats and a large force of men navigating the Missis-
sippi river.   At the time in question it had other rafts laid
up in Boston Bay, which Willits was then watching under
a contract by which he furnished shore privileges, and
watched the rafts of the Knapp Company in Boston Bay,
whether one or many, for one dollar a day.   The Knapp
Company wrote Willits, under date of November 12th, that
McCaffrey had been in St. Louis claiming several things,
and it therefore requested Willits to safely preserve the let-
ter and telegram of the Schulenburg Company, and to
remember what McCaffrey might say, and to talk as little
as possible himself about the matter.

It is our opinion that when Tromley hired Willits to
watch the raft he did not deliver possession of it to Willits,
and that Willits never was in possession thereof.   A mere

McCaffrey v. Knapp, Stout & Co. Company.

watchman is not in possession of the property he guards. Willits' watching was evidently to see that the raft did not break up and was not injured by the action of the water. Unless it became out of order he had no occasion to be upon the raft at all. The voyage of the raft was not ended. The contract relating thereto had only been partly performed by McCaffrey. He still had to tow it to St. Louis. Whether he should finally be ordered to do it that fall or the next spring made no difference. He, by his crew, tied it to the shore with his lines and set his coal barge at the rear, and before the sale to the Knapp Company also set his steamer in the side of the raft. McCaffrey had just as full and complete possession of the raft as he had of his own steamer and coal barge. It will not be pretended that the Schulenburg Company or the Knapp Company ever had possession of the steamer or barge. The fact that two of the lines McCaffrey placed upon the boat and raft the day before the sale, to fasten them more securely to the shore, were the property of the Schulenburg Company, did not, in our opinion, put the Schulenburg Company in possession. If Willits in any sense received possession of the raft from Tromley, it was as agent and servant of McCaffrey, and he had no authority to transfer that possession to either the Schulenburg Company or the Knapp Company. He never did deliver manual possession to either, and the paper delivery he attempted by the receipt he gave Baker was ineffective. We are of opinion McCaffrey had possession of the half raft till he surrendered it under the order of the court. He therefore had everything necessary to entitle him to a bailee's lien.

McCaffrey has no adequate remedy at law. He has a right of action at law for his charges against the Schulenburg Company, but it is insolvent. If he should obtain judgment and execution and seek to levy on the raft, he would be liable to share with other executions against the Schulenburg Company. An attachment in his favor levied thereon would lead to a like result. His lien was paramount to all others. A remedy by which he could be compelled to

share with other creditors of an insolvent would be inade-
quate.   He had a right to hold the raft till his charges were
paid.   But his possession and his lien were both disputed.
The Knapp Company obviously intended to take the raft
away.   As it was upon the water and near the channel of
the river, the ropes could be cut or removed and the raft
taken away by a steamer at any time, unless guarded by a
force of men at much expense, and in a way likely to lead
to a breach of the peace.   Can a bailee in possession in such
case have the aid of a court of equity, or must he be left
either to maintain a small army at his own expense, or to
let his rights be taken away from him and then sue the *tort
feasor* at law ?   McCaffrey's position was in many respects
similar to that of a pledgee or chattel mortgagee, and their
right to foreclose their lien in equity is well established.
Dupuy v. Gibson, 36 Ill. 197; Cushman v. Hayes, 46 Ill. 153;
Barchard v. Kohn, 157 Ill. 579, 585; Charter v. Stevens, 3
Denio (N. Y.), 33; Story on Bailments, Sec. 348; Pomeroy's
Eq. Juris., Secs. 164, 1231.   The right to enforce a bailee's
lien in equity comports with equitable principles.   1 Pom-
eroy's Eq. Juris., Sec. 112, mentions "those cases in which
the relief is not a general pecuniary judgment, but is a decree
of money to be obtained and paid out of some particular fund
or funds.   The equitable remedies of this species are many
in number and various in their external forms and incidents.
They assume that the creditor has, either by operation of law,
or from contract, or from some acts or omissions of the debtor,
a lien, charge or incumbrance upon some fund or funds be-
longing to the latter, either land, chattels, things in action, or
even money; and the form of the remedy requires that this
lien or charge should be established and then enforced, and
the amount due obtained by a sale, total or partial, of the
fund."   In section 171, the same author classifies "those
remedies which establish and enforce liens and charges on
property, rather than rights and interests in property, *    *
by means of a judicial sale of the property itself, which
is affected by the lien, and a distribution of its proceeds
*    *    *    until they satisfy the claim secured by the lien."

2 Kent's Com. 642, says: " A lien is in many cases like a distress at common law, and gives a party detaining the chattel the right to hold it as a pledge or security for the debt, but not to sell it.   *   *   *   I presume that satisfaction from a lien may be enforced by a bill in chancery." Cowen's Treatise, 3d Ed. 337, after stating that a party detaining a chattel by virtue of his lien thereon for charges, has a right to hold it, but not to sell it, says: " It is supposed that the only way in which satisfaction from a lien can be enforced, is by a bill in chancery."   In 2 Redfield on Railways, 160, Sec. 22, Par. 14, that author says: " Neither the carrier, nor any other bailee having a lien, can sell the goods at common law in satisfaction of the lien.   The appropriate remedy in such case is in equity."   2 Rorer on Railroads, 1268, discussing the carrier's lien on freight for charges, and that such lien only gives the right to retain and not to sell the property, further says: " If the carrier will sell, other than when the statute allows it, he may find a remedy and means of selling by judicial proceedings to enforce the lien." In Gilchrist v. Galena, H. S. & S. R. R. Co., 58 Fed. Rep. 708, the United States Circuit Court for Montana sustained a bill to enforce a lien.   The relief was in part based upon the fact that the plaintiff had a lien and had a right to have it enforced, but had no plain, speedy and adequate remedy at law.   Fox v. McGregor, 11 Barb. 41.   Jones on Liens, Vol. 2, Sec. 1038, states the contrary rule—that a court of equity has no jurisdiction to enforce a common law lien by a sale, merely because there is no remedy at law, or because the retaining of possession under a passive lien involves expense or inconvenience.   That author, in section 1041, recognizes Illinois as an exception, and as a State in which a court of equity has jurisdiction to enforce liens upon personal property generally, citing Cairo & V. R. R. Co. v. Fackney, 78 Ill. 116.   The court there said: " Liens are enforceable in equity unless the law has provided for another mode.   This is true of vendors' liens; equitable and other mortgages, and all statutory liens, so far as they now occur to us, except in all cases where the lien is in the nature of a pledge, and pos-

session accompanies the lien. If defendant in error had a lien, he should have resorted to equity for its enforcement." The general principle and the reason there stated, sustain the present suit, while the exception suggested by the court seems against it.

But if a mere desire on the part of the complainant to collect his debt would not give jurisdiction to a court of equity to order the property held under the lien sold to pay it, there seem here to be other sufficient reasons for applying to equity. The Schulenburg Company claimed to have sold to the Knapp Company, and the latter claimed to have bought. Almost immediately after the alleged sale the Schulenburg Company made an assignment for the benefit of creditors. The pleadings show the assignees do not admit the sale from the Schulenburg Company to the Knapp Company, but deny it in general terms. McCaffrey had no other effective way of determining with whom he might safely deal. Both the Schulenburg Company and the Knapp Company have always denied that McCaffrey had a lien, and that he ever had possession after the raft was laid up in Boston Bay. Both said defendants claim that the raft was by McCaffrey delivered to the Schulenburg Company when it was put into that harbor; that the Schulenburg Company thereafter remained in possession of the raft till it was sold to the Knapp Company, and that it then put the Knapp Company in possession, and that the latter thereafter remained in possession. The Knapp Company declared in its answer its right and purpose to remove the raft, and it declared the same thing to McCaffrey before the bill was filed. The bill stated that the raft was so near the channel that when the annual June rise in the Mississippi should take place it would be likely to break up and destroy the raft unless moved further inland, and that his right to move it was in dispute; and the answer of the Knapp Company makes it clear he could not have so removed it without resistance. It was his duty to protect this property while in his possession. It was valuable, and he would be responsible for any injury which could be traced to his neglect. He needed the help of a court of equity to keep him undisturbed in the control and

care of the property. Such assistance could be afforded him under his prayer for general relief. It is plain from the pleadings that a large force of men was necessary to enable McCaffrey to retain the possession he had, and which he was entitled to retain. We are of opinion that under all these circumstances it was proper for him to resort to a court of equity and bring all parties in interest before the court to have the questions of his possession and lien, and the validity of the sale to the Knapp Company, and the rights of the assignees, determined by a decree binding upon them all.

It is said the Circuit Court of Mercer County had no jurisdiction because this was a maritime lien, and exclusive jurisdiction in such case is, by act of Congress, vested in the courts of the United States sitting in admiralty. Can the Knapp Company now raise that question in the condition of this record? On April 2, 1895, and before answer, the Knapp Company filed a written petition in this case, wherein it asked the Circuit Court either to require McCaffrey to give a bond, with sureties in the sum of $25,000, conditioned to pay the Knapp Company whatever damage it might suffer if the case should be decided against McCaffrey, or else that, upon the said Knapp Company giving a bond in the sum of $6,000 to pay McCaffrey any lien which might be established in his favor, " then that this defendant shall have a right to take possession of said raft and remove the same to St. Louis, Missouri." As a reason, the Knapp Company added : " The defendant being in a court of equity, and believing that it is but right that this motion should be granted, prays the court to grant the same." Thereupon the court heard said petition, and, by consent of the parties, ordered that the Knapp Company file a bond in the penal sum of $6,000, with sureties, conditioned to pay " McCaffrey all sums of money for which he has a lien upon the property described herein," and that upon the filing and approval of such bond McCaffrey " shall surrender the property above described to the Knapp, Stout & Co. Company." Bond was so given, and the Knapp Company took the raft away. The order provided with great care that no one should be preju-

diced by the order; that it should not be construed to be a confession of anything by anybody, nor an admission that the court had jurisdiction, etc. Nevertheless, the order was much to the detriment of McCaffrey, and took from him important rights. It is very earnestly argued here by the defendants that if McCaffrey had any lien it was but a passive lien entitling him to retain possession of the raft till his charges were paid, but for which he had no other remedy. But if so, his passive lien was destroyed under this order. He no longer had possession. The raft was gone. It is a fair presumption that when the Knapp Company got the raft to St. Louis the lumber was distributed in its yards, and no longer traceable, and that it was impossible for the complainant to repossess himself of the raft. It is also strongly urged here by defendants that if any tribunal can enforce McCaffrey's lien it can only be done by a suit *in rem* in admiralty. But the *res*, the thing, is gone; is dispersed; and McCaffrey's remedy in admiralty, if he ever had one, has been taken away from him under this order. True, McCaffrey consented to the order, but he was claiming a court of equity had jurisdiction, and it was in harmony with his position that the court should assume to dispose of the raft. The filing of the bill had not put the court in possession of the raft. It was the defendant, the Knapp Company, that appealed to the court to permit it to give a bond and take the raft away, and it expressly based its petition upon the ground that it was in a court of equity, and that it was equitable that the court should accept a bond and order McCaffrey to surrender the raft to it. The Knapp Company asked and obtained this relief from a court of equity and practically destroyed McCaffrey's security unless his rights can be enforced in this cause. It is also true that in its motion the Knapp Company denied the jurisdiction of the court, and the court in its order provided that the order should not be construed as an admission of jurisdiction, but this only puts the Knapp Company in the position of denying the court's jurisdiction in one breath, and in the next breath asking the court to take jurisdiction and give equitable relief

McCaffrey v. Knapp, Stout & Co. Company.

in a material matter.   Having asked and obtained the exercise of jurisdiction, its denial of jurisdiction at the same time was idle.   We think the Knapp Company should be estopped by that action from questioning the jurisdiction of the Circuit Court of Mercer County.   As the proof shows a valid' sale by the Schulenburg Company to the Knapp Company before the assignment, the Schulenburg Company and its assignees have no further interest in the raft, and as the Knapp Company is estopped from questioning the jurisdiction of the court below, that tribunal should have given McCaffrey a decree.

Does he who, in the performance of a contract, renders services in towing a floating raft of lumber on a navigable river, have a maritime lien thereon for such services? Is such a raft a proper subject of admiralty jurisdiction? Upon these questions the authorities are in conflict.   The following tend to support the contention that such a raft is not within the jurisdiction of admiralty: Tome v. Four Cribs of Lumber, Taney's Decisions, 533; Jones v. Coal Barges (Grier, J.), 3 Wall. Jr. 53; The W. H. Clark, 5 Biss. 295, 308; A Raft of Cypress Logs, 1 Flippin, 543; Raft of Timber, 2 Robinson's Admiralty, 251; Henry on Admiralty Jurisdiction, Sec. 52.   See also Gastrel v. Cypress Raft, 2 Woods, 213; The Hendrick Hudson, 3 Benedict, 419.   The contrary doctrine, that a raft of lumber may in a proper case come within the jurisdiction of courts of admiralty, is supported by the following: United States v. One Raft of Timber, 13 Fed. Rep. 796; Muntz v. A Raft of Timber, 15 Fed. Rep. 557; Cartier v. The F. & P. M. No. 2, 33 Fed. Rep. 511; Seabrook v. Raft of Ties, 40 Fed. Rep. 596; Salvor Wrecking Co. v. Sectional Dock Co., 3 Cent. Law Jour. 640; Raft of Spars, 1 Abb. Adm. 485; Fifty Thousand Feet of Lumber, 2 Low. 64.   See also Nicholson v. Chapman, 2 H. Black. 254, and an *obiter dictum* in The Rock Island Bridge, 6 Wall. 213.   Perhaps the sounder argument supports the position that such a raft on a navigable river is a proper subject of admiralty jurisdiction, but where the question is left in so much doubt by the conflicting decisions of the

various courts of admiralty, and the opposite view is supported by so strong authority as Chief Justice Taney and Justice Grier of the United States Supreme Court, the State courts should hesitate to renounce jurisdiction in a case like this, where no proceeding affecting the rights of the parties has ever been instituted in any court of admiralty.

The jurisdiction of the courts of the United States to administer relief by proceedings *in rem* in admiralty is unquestionably exclusive. Such proceeding, however, is against the property only. "The distinguishing and characteristic feature of such suit is that the vessel or thing proceeded against is itself seized and impleaded as the defendant, and is judged and sentenced accordingly. It is this dominion of a suit in admiralty over the vessel or thing itself which gives to the title made under its decree validity against all the world." The Moses Taylor, 4 Wall. 411. No person is a defendant in such a suit. Parties who have real or possible interests determine for themselves whether they will appear and protect their interests. When a sale is made in such a proceeding it is good against the whole world. No such remedy was sought here. This was a suit against persons. No one would be bound by a decree herein except those made parties. A sale, though purporting to be of the property, would really be only a sale of the interests of the defendants therein. A personal decree for the deficiency, if any, might follow. The equitable circumstances before mentioned, growing out of the sale and assignment, the denial of possession, the intention to seize the property, the duty of McCaffrey to protect it from a rise of the river and the obstacles to so doing put in his way by the Knapp Company, all furnish ground for equitable cognizance. We can not hold that because a proceeding against the raft in admiralty might afford some relief, therefore a court of equity must keep its hands off if equitable circumstances exist which justify its granting relief on well established equitable principles against persons made defendants. Moreover if the case had any likeness to a suit *in rem* in admiralty when it was started, it lost that distinctive character when

the Knapp Company, at its own request, took the raft and left a personal bond in its place. Thereafter the suit was wholly *in personam*. Johnson v. Chicago & Pacific Elevator Co., 119 U. S. 388; Gindele v. Corrigan, 28 Ill. App. 476; 129 Ill. 582. Though the cases cited were at law, yet they are in point as to the effect of giving bond and taking away the property. By the action of the Knapp Company the raft was withdrawn from the suit, and a suit relative to liability upon a personal obligation was substituted therefor. The suit, as so changed by the act of the Knapp Company, was not within the jurisdiction of a court of admiralty.

For the reasons stated the decree of the court below will be reversed and the cause remanded to that court with directions to enter a decree in conformity with the views herein expressed in favor of McCaffrey in the sum of $3,643.17, with interest thereon from November 13, 1894, at five per cent per annum.

Reversed and remanded with directions.